# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Upon Remand from the Tennessee Supreme Court

## STATE OF TENNESSEE v. MITCHELL SHEPHARD

**Direct Appeal from the Criminal Court for McMinn County**
**No. 98-646      R. Steven Bebb, Judge**

---

**No. E2002-02851-CCA-RM-CD**
**January 10, 2003**

---

This case is before this court upon remand from the Supreme Court of Tennessee.  In our original opinion we affirmed defendant's conviction for first degree murder in perpetration of aggravated child abuse but remanded to the trial court for a new sentencing hearing.  In our original opinion we examined numerous issues, including whether the trial court erred in failing to instruct the jury on the lesser-included offenses of reckless homicide and criminally negligent homicide.  We concluded the failure to charge these offenses constituted harmless error.  The remand from the Supreme Court of Tennessee indicates we should reconsider the lesser-included offense issue in light of State v. Locke, _____ S.W.3d _____, 2002 Tenn. LEXIS 474 (Tenn. Nov. 14, 2002).  We now conclude that the trial court's failure to instruct the jury on the lesser-included offenses of reckless homicide and criminally negligent homicide constitutes reversible error.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Remanded for New Trial**

JOE G. RILEY, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Charles M. Corn, District Public Defender (at trial); and John B. Nisbet, III, Cookeville, Tennessee (on appeal), for the appellant, Mitchell Shephard.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Jerry N. Estes, District Attorney General; Amy F. Reedy and William W. Reedy, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION UPON REMAND

We reiterate the underlying facts as set forth in our opinion in the original appeal:

> The defendant and Tammy Shephard (hereinafter "Tammy") were married in September 1997, and Tammy gave birth to the victim, Brandon Shephard, on May 5, 1998.  She testified that the

defendant was often angry following the victim's birth, and he thought that she spoiled the victim and held him too often. On a Saturday in September 1998, Tammy, her son Steven, the victim, and the defendant went to K-Mart. While in K-Mart, Tammy asked the defendant to take the victim into the restroom to change his diaper. She stated that the defendant exhibited disapproval with the undertaking, but he complied. Tammy described the victim's demeanor as "fine" before the defendant took him into the restroom, and she stated that he was not crying. She waited within sight of the restroom's entrance, and approximately five minutes later, the defendant exited the restroom holding the victim tightly. She stated the victim was crying to the point where he could hardly "gulp in breath;" his crying appeared uncontrollable; and his face was red. Tammy further stated that she had never seen the victim cry in such a manner. The defendant refused her request to tender the victim, so she pulled the victim from the defendant's arms, which angered the defendant. They left K-Mart, and the defendant was still angry while driving home.

After arriving at home, the victim began showing signs of sickness. The victim was very drowsy, had a fever, and vomited to the point that he "threw up everything that went into his stomach." Tammy testified that the victim slept throughout Saturday night and all day on Sunday, and although the victim remained drowsy and had a poor appetite, he ceased vomiting. After Tammy expressed concern for the victim's condition, the defendant stated that the victim "had the punies" and would be okay. On Sunday night, Tammy went to work at approximately 11:00 p.m., which left the defendant alone with the victim. The next time Tammy saw the victim was at approximately 4:00 a.m. at the hospital emergency room.

Karen Headrick, an employee of the Department of Children's Services, testified that she visited with the defendant and Tammy in the maternity ward of the hospital two days after the birth of the victim. During that visit, the defendant and Tammy agreed to a parenting plan in which the defendant was to have no unsupervised contact with the victim; the defendant was to attend anger management and parenting classes; and a Homemaker from the department would visit the home three times per week. During that meeting, the defendant was very cooperative and acknowledged that he had an anger management problem. However, the defendant and Tammy subsequently refused to comply with the conditions of the agreement, and the defendant threatened the Department of Children's Services with legal action. The department responded to the defendant's threat by filing an action in juvenile court, and on

September 8th, prior to the hearing, the defendant agreed to cooperate per the advice of his attorney. Nevertheless, the defendant again failed to comply with the conditions of the agreement, and Headrick next saw the defendant on September 28th at the children's hospital where the victim was on life support. She stated that the defendant exhibited no emotion at the hospital.

Gale Ernsting was the on-duty emergency room clerk at Athens Regional Medical Center during the evening of September 28th, when the defendant entered with the victim. She stated that the defendant casually walked inside the hospital and did not appear in a hurry. He had the victim on his shoulder, and it appeared the victim was sleeping. The defendant informed her that the victim had vomited and experienced difficulty breathing. While Ernsting was completing admittance forms, the defendant stated "maybe you had better have a nurse come now to check it." When the nurse came, the defendant positioned the victim so Ernsting was able to view the victim's face, which Ernsting described as blue in appearance. Ernsting further testified that the defendant never exhibited any emotion.

Ben Javana Byrd was the triage nurse at Athens Regional Medical Center. Byrd testified that the victim was not breathing; he had no pulse; his face was blue; and his temperature was 93 degrees. During Byrd's conversation with the defendant, the defendant did not inquire about the victim's condition; however, he stated that the "baby-sitter said [the victim] spit[] up and I heard him gurgling." The defendant further inquired if Byrd was "going to call the police," because "in the past, I've been accused of abuse." Byrd testified that the defendant exhibited no emotional reaction after they regained the victim's pulse.

Kenneth Terry Bowers, a former detective sergeant with the Athens Police Department, testified that he interrogated the defendant at East Tennessee Children's Hospital. In the defendant's statement, he stated he was "really stressed out lately," and at approximately 2:00 a.m. the victim cried, which angered him. The defendant stated that he placed the victim back in his crib, "started throwing toys" at him, and then "accidentally hit him on the back of the head with a little TV." The defendant said the victim gasped for air a few minutes later, and he took the victim to the hospital. The defendant acknowledged having a problem for which he needed help.

Dr. Gary Gitschlag, a pediatric ophthalmologist, testified that he examined the victim at the hospital, and the victim suffered from

-3-

a cerebral hemorrhage and an extensive bilateral hemorrhage in the back layer of both eyes. He testified that the bilateral hemorrhage was not due to an accident, and opined that the victim died due to "shaken baby syndrome."

Dr. Joseph Childs, a pediatrician, treated the victim at East Tennessee Children's Hospital. Dr. Childs testified that when he examined the victim, the soft spot of the victim's head was firm and his pupils were very small and exhibited little reaction to light. He explained that the condition of the victim's soft spot and pupils evidenced that the victim suffered brain damage. When Dr. Childs dilated the victim's eyes, he saw a large amount of blood over the victim's retina, evidencing a retinal hemorrhage. Dr. Childs stated that the victim appeared pale and blue with no external signs of trauma except one small bruise on the facial chin bone. The CAT scan revealed that there was blood surrounding the surface of the brain. Dr. Childs testified that he diagnosed the victim with "shaken baby syndrome," and the injuries sustained by the victim could be caused only by "violent forces . . . that anyone observing it would immediately recognize this could cause great harm to the child."

Dr. Ronald Toolsie, a pathologist and the Bradley County Medical Examiner, testified that he performed an examination on the victim. He testified the victim had two fractured ribs on his right side, due to injuries that occurred within a period of days prior to death. Dr. Toolsie opined that the trauma which caused the broken ribs occurred on or about September 26, 1998, and that the fractures were a result of "the enormous pressure of squeezing." He further opined that there was a link between the victim's rib fractures and the shaken baby syndrome damage to his brain.

State v. Mitchell Shephard, No. E2000-00628-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 499, at **2-8 (Tenn. Crim. App. July 3, 2001, at Knoxville), *remanded* (Tenn. Dec. 2, 2002).

## LESSER-INCLUDED OFFENSES

At issue in this remand is defendant's contention that the trial court erred in failing to instruct the jury on reckless homicide and criminally negligent homicide as lesser-included offenses of first degree murder in perpetration of aggravated child abuse. The trial court did instruct the jury on aggravated child abuse of a child six years of age or less, a Class A felony, and child abuse of a child six years of age or less, a Class D felony. *See* Tenn. Code Ann. §§ 39-15-402, -401. In our original opinion we concluded the trial court erred in failing to instruct on the lesser-included offenses of reckless homicide and criminally negligent homicide. *See* State v. Ely, 48 S.W.3d 710, 716 (Tenn. 2001) (holding reckless homicide and criminally negligent homicide are lesser-included offenses of felony murder). However, we further concluded the jury's finding of guilt of the greater offense

-4-

of felony murder and its rejection of the lesser-included offenses of Class A felony aggravated child abuse and Class D felony child abuse rendered the error harmless under State v. Williams, 977 S.W.2d 101 (Tenn. 1998).

Subsequent to the release of our original opinion, the Tennessee Supreme Court clarified the harmless error inquiry when the trial court improperly omits to instruct on lesser-included offenses. *See* State v. Allen, 69 S.W.3d 181 (Tenn. 2002). Specifically, it held the proper inquiry is "whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial." *Id*. at 191. Thereafter, our state supreme court clarified the Williams harmless error analysis when the jury finds the defendant guilty of the highest offense to the exclusion of immediate lesser-included offenses. *See* State v. Locke, ____ S.W.3d ____, 2002 Tenn. LEXIS 474 (Tenn. Nov. 14, 2002). In Locke, the court found reversible error in the failure to charge second degree murder, reckless homicide and criminally negligent homicide as lesser-included offenses of felony murder even though the jury rejected facilitation of felony murder, which was charged as a lesser-included offense. *Id*. at ____, 2002 Tenn. LEXIS 474, at **19-22. In doing so, the court noted that facilitation was a separate and distinct theory of liability and required a different mental state than the lesser degrees of homicide. *Id*. at ____, 2002 Tenn. LEXIS 474, at **19-21.

We now examine, in light of Locke, whether it was harmless error not to charge the lesser offenses of reckless homicide and criminally negligent homicide in the case before us. Initially, we note that aggravated child abuse and child abuse, which were charged by the trial court, are not homicide offenses. Furthermore, a guilty finding on either of these offenses would require the jury to find the defendant acted "knowingly, other than by accidental means. . . ." Tenn. Code Ann. §§ 39-15-401(a), -402(a). Reckless homicide and criminally negligent homicide have lesser mental states; namely, reckless and criminal negligence, respectively. *See* Tenn. Code Ann. §§ 39-13-215(a), -212(a). The only significant disputed issue at trial was whether the defendant acted "knowingly;" therefore, reckless homicide or criminally negligent homicide was more in keeping with the defense theory. *See* Allen, 69 S.W.3d at 191 (providing that the reviewing court in conducting a harmless error review should thoroughly examine the record, including the evidence presented at trial, the *defendant's theory of defense*, and the verdict returned by the jury). In this case, we are unable to conclude beyond a reasonable doubt that the failure of the trial court to instruct on these lesser-included offenses did not affect the outcome of the defendant's trial. Accordingly, we hold that the error was not harmless.

The judgment of the trial court is reversed, and this case is remanded for a new trial.[1]

_____
JOE G. RILEY, JUDGE

_____

[1]Upon remand, the trial court should be guided by our findings of error with regard to certain prior bad acts evidence and the jury charge on punishment. *See* Mitchell Shephard, 2001 Tenn. Crim. App. LEXIS 499, at **16-21, 31-36.